UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| STEPHEN SHUPICK, | ) | CIV. 08-5095-JLV |
| | ) | |
| Plaintiff, | ) | ORDER |
| | ) | AFFIRMING DECISION OF |
| vs. | ) | THE COMMISSIONER AND |
| | ) | DISMISSING PLAINTIFF'S |
| MICHAEL J. ASTRUE, | ) | COMPLAINT |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

This matter is before the court pursuant to a complaint filed by

plaintiff Stephen Shupick on December 19, 2008, appealing the denial of his

application for disability insurance benefits by the Social Security

Administration. (Docket 1). Defendant opposes Mr. Shupick's complaint

and moves the court to dismiss it in its entirety. (Docket 6). The court has

jurisdiction over this case pursuant to section 205(g) of the Social Security

Act, 42 U.S.C. § 405(g), and the case is ripe for adjudication.

## FACTUAL AND PROCEDURAL HISTORY[1]

At the time of the filing his application for disability insurance

benefits, Mr. Shupick was 56 years old. (AR 116). Mr. Shupick is single

---

[1]The court shall cite to information in the administrative record by
referencing "AR" followed by the appropriate page number(s) where the
information may be found.

and has no children.  (AR 116-117).  Mr. Shupick has nine siblings and was raised on a ranch in Eagle Butte, South Dakota.  (AR 298).  In 1968, at age 17, Mr. Shupick was involved in a motor vehicle accident and suffered a severe craniocerebral injury to the frontal areas of his brain.  (AR 307).  He underwent a cranioplasty in June 1969, but shortly thereafter he hit the front of his head while diving into a pool and underwent a second cranioplasty.  Id.

After graduating from high school, Mr. Shupick worked on his family's ranch for approximately five years.  (AR 298).  With the assistance of vocational rehabilitation services, Mr. Shupick completed a course in electronics at a vo-tech school in Sturgis, South Dakota.  Id.  Mr. Shupick worked for three years at a company that installed and repaired two-way radios.  Id.  Much of this time was spent traveling.  Id.  The job ended when Mr. Shupick had a major seizure.  Id.  Mr. Shupick has suffered from a seizure disorder since the age of 10, but this has been controlled by medication and he has not had a seizure since 1979.  (AR 309).

Mr. Shupick then completed training to become a registered nurse, again with the assistance of vocational rehabilitation services.  (AR 299).  Mr. Shupick began working for the VA hospital in Hot Springs, South Dakota, in September 1987 as a registered nurse.  (AR 151).  Mr. Shupick explained that his job duties included "medication distributions, treatments,

hygienes [sic] things, monitor vital signs, deliver water or blankets, all aspects of being a RN." Id. Mr. Shupick remained working at the VA hospital until March 21, 2006, when he was approved for disability retirement under the Federal Employees Retirement System (FERS). (AR 150, 226-229).

On November 6, 2006, Mr. Shupick protectively filed an application for disability insurance benefits ("DIB") with the Social Security Administration (hereinafter the "Agency") pursuant to Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*[2] (AR 9). Mr. Shupick filed a formal application for benefits on November 16, 2006.[3] (AR 116-120). Mr. Shupick alleged that his disability stemmed from a brain injury, dementia, epilepsy, memory and vision problems, depression, allergies, high blood pressure,

---

[2] Section 423 of Title 42 of the United States Code defines "disability" for purposes of receiving DIB benefits as, in relevant part, the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A)

[3] On November 16, 2006, Mr. Shupick also filed an application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act. (AR 9). The Agency denied his claim on November 23, 2006, because of Mr. Shupick's excess income. Id. Mr. Shupick did not appeal this determination. Id.

and headaches.  (AR 76).  Mr. Shupick's onset disability date was listed as March 21, 2006.  (AR 116).

The Agency initially denied Mr. Shupick's application for benefits on February 2, 2007.  (AR 71-73).  In support of its decision, the Agency made the following determinations:

> You state that you are disabled due to dementia, epilepsy, memory problems, depression, allergies, high blood pressure, vision problems, and headaches.  Although you may have some limitations due to your impairment, it does not severely limit your ability to do some types of work.  Medical evidence reports your intellect to be in the average range with immediate memory limitations close to the borderline range.  Neither seizures or headaches are severe or frequent enough as to cause a severe restriction of ordinary activities.  No severe complications have resulted from elevated blood pressure which can be controlled by treatment.  You are able to move about and use your arms, hands and legs in a satisfactory manner.  You are independent in your activities of daily living and are able to think, reason and act in your own best interest.  Your visual problems are not severe enough to limit most ordinary activities.  The reports do not show any other condition which would severely limit the ability to work.  Considering medical records, age, education and work history, we have concluded that you are able to do work not involving stressful or prolong periods of concentration.

(AR 71).

Mr. Shupick filed a request for reconsideration of the Agency's decision on February 28, 2007.[4]  (AR 74-75).  On May 16, 2007, the Agency independently reviewed Mr. Shupick's case and determined that the denial

---

[4]In this request, Mr. Shupick stated, "I continue to suffer from my conditions which keeps [sic] me from performing substantial gainful activity." (AR 74).

of his claim was proper.  (AR 76-78).  In reaching this decision, the Agency

made the following determinations:

> You state that you are disabled due to brain injury, dementia, epilepsy, memory and vision problems, depression, allergies, high blood pressure and headaches.  Medical evidence shows satisfactory neurological function.  Your seizures are not so severe or frequent as to cause a severe restriction of ordinary activities.  There is no indication of nerve or muscle damage which would result in severe weakness or loss of function.  Your visual loss is not severe enough to limit most ordinary activities.  Your ability to think, remember, understand, and communicate is not severely restricted.  No severe complications have resulted due to your allergies and high blood pressure which can be controlled by treatment.  Although you have pain, it does not severely limit normal daily activities.  The evidence shows these conditions do not severely limit the ability to work.  Considering medical records, age, education and work history, we have concluded that you are able to do work with basic job requirements, not involving stressful or prolong periods of concentration.

(AR 76).

On June 15, 2007, Mr. Shupick timely filed a request for a hearing

before an Administrative Law Judge (hereinafter "ALJ").[5]  (AR 79-81).  On

May 28, 2008, an administrative hearing in this matter was held before ALJ

James W. Olson.  (AR 19-65).  Mr. Shupick appeared in person and through

his attorney, Michael Simpson.  (AR 19).  Mr. Shupick testified at the

hearing as did vocational expert William Tysdal and medical expert Dr.

Thomas Atkin.  (AR 20).

---

[5]In his request for a hearing, Mr. Shupick stated, "I continue to suffer from my condition(s) which keeps me from performing substantial, gainful activity."  (AR 80).

On August 19, 2008, the ALJ issued a written opinion denying Mr. Shupick's application for benefits. (AR 9-18). On September 8, 2008, Mr. Shupick requested review of the ALJ's decision by the Agency's Appeals Council.[6] (AR 5). The Appeals Council considered Mr. Shupick's objections to the ALJ's decision. (AR 1-3). On December 8, 2008, the Appeals Council denied Mr. Shupick's request for review, finding "no reason" to review the ALJ's decision. AR 1. In light of the Appeals Council's denial of review, the ALJ's decision stands as the final decision of the Agency. 20 C.F.R. § 416.1481.

After exhausting all administrative remedies, Mr. Shupick timely filed in federal court a complaint against the Commissioner of the Agency appealing the denial of DIB benefits.[7] (Docket 1). Mr. Shupick moves the court to reverse the decision of the ALJ, find that he is entitled to benefits, and award costs and reasonable attorney's fees under 42 U.S.C. § 406(b)(1) and the Equal Access to Justice Act, 28 U.S.C. § 2412. Id. Defendant moves the court to dismiss Mr. Shupick's complaint in its entirety. (Docket 6). Pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this court has appellate jurisdiction over Mr. Shupick's case, which is ripe for adjudication.

---

[6]Mr. Shupick's request alleges, "The ALJ's decision is not supported by substantial evidence and is affected by error of law." (AR 5).

[7]Filed on December 19, 2008. (Docket 1).

# MENTAL HEALTH RECORDS

## A.    First Evaluation by Dr. Scott Cherry

On September 26, 2002, Mr. Shupick saw Dr. Scott Cherry of the
Black Hills Rehabilitation Hospital for a neuropsychological evaluation.
(AR 307-312).  Dr. Cherry administered a variety of tests to assess
Mr. Shupick's level of cognitive and emotional functioning.  (AR 307).
Mr. Shupick complained of some difficulties in processing recent memories,
although his remote and immediate memory appeared appropriate.  Id.
Mr. Shupick stated that he established a routine to allow him to function
appropriately every day, yet he had difficulty adapting to changes in his
routine.  (AR 309).  Mr. Shupick characterized himself as a "loner," with
questionable bouts of depression and social anxiety.  Id.  Mr. Shupick
indicated that he was not receptive to counseling.  Id.  He expressed some
occupational discontent because he had not had a pay raise in several
years.  Id.

With respect to Mr. Shupick's memory, test results showed the
following:

> Assessment of memory processing, auditory memory via verbal
> learning over trials, indicated a mild degree of deficit in immediate
> memory span.  Mr. Shupick demonstrated a moderate degree of
> deficit in initial learning with a moderate degree of deficit in his
> learning curve.  Recall memory after an interference task was
> moderately impaired with delayed recall being mildly impaired and
> delayed recognition being intact; however, a mild degree of intrusions
> were noted.

Assessment of complex immediate delayed and delayed recognition memory were within range.

Complex visual spatial construction abilities were intact with appropriate processing speed.

Executive functioning (conceptual tracking and shift of set) was mildly impaired with verbal fluency, access to semantic memory, hypothesis testing and generation, nonverbal problems solving and abstract reasoning, mental efficiency, and flexibility being moderately to severely impaired with a moderate degree of perserverative responses.

(AR 310-311).

Dr. Cherry opined that Mr. Shupick had neuropsychological deficits most pronounced in "auditory memory processing, both in learning and acquisition of new information and recall of that information, with deficits noted in executive functioning of verbal fluency, access to semantic memory, hypothesis testing and generation, mental flexibility and efficiency, conceptual tracking, and shift of set." (AR 311). Mr. Shupick appeared to be experiencing pervasive dysthymia with recurring periods of anxiety and impaired interpersonal relationships. Id. Dr. Cherry noted that Mr. Shupick was deficient in executive functioning which could impair "organization, planning, future orientation, insight, mental flexibility, and self-monitoring of ongoing behavior." Id. Dr. Cherry opined that, due to difficulties in decision-making, Mr. Shupick should not be directly involved in direct patient care, such as medication administration, but may be involved at the administrative or social level of patient care. (AR 312).

**B.      Evaluation by Dr. Allen Gee**

On June 25, 2004, Mr. Shupick saw Dr. Allen Gee of Frontier Neurosciences, LLC, for a second opinion and neurology consultation at the request of Dr. James Bowman, Mr. Shupick's treating physician.  (AR 304-306).  Dr. Gee noted that Mr. Shupick's affect was flat, with "some decreased verbal fluency and some mildly slurred processing."  (AR 305).  Mr. Shupick appeared oriented to person, place, and time, and his recent and remote memory was intact.  Id.  Mr. Shupick's attention span was normal, his speech fluent, and his language appropriate.  Id.  Dr. Gee opined that Mr. Shupick's "increased memory difficulties may be secondary to medications, metabolic etiology or depression."  Id.  Dr. Gee also noted that a prior 2002 neuropsych evaluation showed "a decreased auditory processing, decrease in verbal fluency, pervasive dysthymia, [and] deficits of executive functioning and verbal fluency."  Id.  These findings "were consistent with bi-frontal lobe and left temporal lobe dysfunction."  Id.

**C.      Second Evaluation by Dr. Scott Cherry**

Upon referral from Dr. Gee, Dr. Cherry saw Mr. Shupick on October 1, 2004, for testing and a second neuropsychological evaluation.  (AR 313-316).  Mr. Shupick indicated that his immediate memory was intact, with difficulty in his recent and remote memory.  (AR 313).  He indicated that his emotional state was the same and that he did not want to

take any medications to address emotional concerns.  Id.  Mr. Shupick

described himself as a loner who relied on others to make decisions and

who experienced bouts of depression and social anxiety.  (AR 313-314).

Test results, in pertinent part, showed as follows:

> Assessment of memory processing, auditory memory via verbal
> learning over trials, indicated a moderate degree of deficit in
> immediate memory span (supra span), with a severe degree of deficit
> in recall and delayed recall with a moderate degree of deficit in
> retention rate, 71%, as well as in recognition memory.
>
> Assessment of visual memory, via visual learning over trials,
> indicated intact immediate memory span (supra span).  Recall was
> mildly impaired with intact delayed recall and delayed recognition
> with an 88% retention rate.
> . . . .
>
> Executive functioning (conceptual tracking, shift of set, and verbal
> fluency) was intact.  There was a severe degree of deficit in access to
> semantic memory, hypothesis testing and generation, concept
> formation and judgment, mental flexibility and efficiency,
> discriminating significant from insignificant details in ones [sic]
> environment, planning ahead and exercising adequate judgment in
> a number of situations, ability to separate critical from irrelevant
> aspects of a situation, benefitting dependently and correctly from trial
> and error experiences in a variety of environmental types of feedback,
> and learning from experiences while adaptively integrating new
> information.

(AR 315).

Test results further indicated that Mr. Shupick may be experiencing

significant psychiatric distress, causing him at times to be depressed,

worried, tense, nervous, and confused and to suffer from insomnia, fatigue,

muscle tension, distracted thinking, and a general dysphoric mood.  Id.

At times, Mr. Shupick demonstrated poor judgment, was highly introspective and socially-uncomfortable, and was plagued by self-doubts. Id. Dr. Cherry opined that Mr. Shupick's most pronounced deficits appeared to be in his auditory memory processing and executive functioning. (AR 315-316).

**D.  Medical Associates of the Black Hills, LLC.**

Treatment records indicate that Mr. Shupick saw Dr. James Bowman sporadically in 2006 at the Medical Associates of the Black Hills. (AR 285-290). Pertinent to this discussion is a letter dated January 24, 2006, written by Dr. Bowman to Mr. Shupick's employer, the Black Hills Health Care System, Department of Veterans Affairs:

> I have known Mr. Shupick for many years. I have been his physician since prior to 2002. He has a known seizure history. He also has a history of closed head trauma. Mr. Shupick has had increasing problems with memory and also varying moods. He also has obsessive compulsive behaviors. He has had extensive evaluation with psychological testing by Dr. Scott Cherry, Ph.D. It has become "quite apparent that Mr. Shupick is functioning at a level which becomes very apprehensive at his job and is almost paranoid of making a mistake which obviously could be injurious." These mistakes, although he is concerned about them, have not occurred and to my knowledge no incompetencies have been observed. It is extremely stressful for him and is consistent with psychological testing performed by Dr. Scott Cherry. It is my impression and Dr. Cherry's that many of the problems that Mr. Shupick is having are quite consistent with his past medical history. Our impression is that Mr. Shupick would be considered for possible disability; therefore eliminating stressful circumstances of his job; [sic] would probably be beneficial . . . .

(AR 28).

E.     **Black Hills Neurology**

Treatment records indicate that Mr. Shupick visited Black Hills

Neurology on January 27, 2005, and on December 5, 2006.  (AR 291-295).

During his first visit, he was seen by Dr. Steven Hata for a neurologic

evaluation.  (AR 292-293).  Dr. Hata stated, in pertinent part, as follows:

> . . . He [Mr. Shupick] has been working in nursing since 1987.  He is
> employed at the Hot Springs VA.  The patient is concerned about
> cognitive deficits that were raised during his neuropsych evaluation
> of 2002, at which time, direct patient care was cautioned against due
> to the possibility of making medication errors due to deficits in
> memory and frontal lobe processing.  Neuropsych evaluation at that
> time showed localizing abnormalities to the frontal lobes and left
> temporal lobe.  He saw Dr. Gee at about the same time for an opinion
> as to employability.  From what I see, no definite conclusions were
> reached.  The patient himself is concerned about the results of
> neuropsych testing.  He had followup neuropsych testing in 2004, the
> results of which I don't have.  He complains of apathy, fatigue,
> depression, and sometimes suicidal thoughts.  He hasn't wanted to
> follow through with psychiatric evaluation and treatment, however.
> Despite his history of traumatic brain injury and cognitive problems
> uncovered by his neuropsych testing, he denies having any problems
> with his employment.  He says he isn't under any observation or any
> status nor has he been in trouble for any nursing errors.  He denied
> any pressure to resign or be reassigned to a less demanding job.  He
> is working on the general medical/surgical ward.  He says it is much
> [more] stressful than when he works in the chronic care unit at the
> VA.

(AR 292).

Mr. Shupick saw Dr. Eric Kelts on December 5, 2006, to receive "help

with some kind of social security."  (AR 294).  Mr. Shupick indicated that he

was making mistakes at his work.  Id.  He indicated that he did not want to

take the antidepressant medication prescribed by Dr. Hata.  Id.  Dr. Kelts

noted that, although Mr. Shupick's mental status was intact, he had mild attention deficits and depression. (AR 295). Dr. Kelts recommended ongoing care and evaluation. Id.

**F.      Evaluation by Dr. Greg Swenson**

On January 10, 2007, Dr. Greg Swenson, upon referral from the South Dakota Disability Determination Services, evaluated Mr. Shupick's mental status and functional limitations. (AR 298-303). Dr. Swenson noted that Mr. Shupick had a mild impairment in attention, but that his recent and remote memory appeared intact. (AR 300). Dr. Swenson noted an impairment in Mr. Shupick's immediate and short-term memory. Id. He noted that Mr. Shupick's motivation and energy level was somewhat below average and his affect was bland, with minimal expression. Id. Mr. Shupick reported that he became annoyed when his schedule changed. Id. Dr. Swenson noted that Mr. Shupick's "thought processes are notable for his preoccupation with his head injury and the accident that occurred approximately 40 years ago." Id.

Dr. Swenson administered the Wechsler Adult Intelligence Scale-III test (WAIS-III), which measures general intelligence and specific cognitive functions. (AR 301). The WAIS-III revealed that Mr. Shupick's intelligence quotients and index scores were within the average range, indicating average general intelligence. Id. Index scores indicated that attention,

concentration, working memory, and ability to comprehend and to use verbal and visual information were average.  Id.  Test scores indicated average ability in the areas of vocabulary knowledge, logical and abstract reasoning, mental arithmetic, memory for digit sequences, factual knowledge, working memory, visual perception and recognition, visual searching and association speed and accuracy, and use of visual information to understand concepts, visual-spatial relationships, and sequences.  (AR 301-302).

Dr. Swenson also administered the Wechsler Memory Scale-III test (WMS-III), which measures immediate and short-term memory functions.  (AR 302).  The WMS-III revealed that Mr. Shupick's immediate memory for auditory and visual information was below average and in the borderline range.  (AR 302).  "Results of the WMS-III indicate significant impairment in immediate and short-term visual memory."  Id.  Although Mr. Shupick's delayed recall for auditory information improved significantly, his delayed memory for visual material remained below average.  Id.  Mr. Shupick's General Memory Index (GMI) score was 79, which was "significantly lower than composite measures of intellectual ability produced on the WAIS-III."  Id.  The GMI is a composite of five tests measuring different aspects of short-term memory.  Id.  His GMI score suggested mild to moderate impairment in immediate and short-term memory, especially visual

memory.  Id.  Mr. Shupick's Global Assessment of Functioning (GAF) level was 65.  (AR 303).  Dr. Swenson noted that Mr. Shupick was capable of managing his finances.  Id.

**G.     Assessments by Dr. Richard Gunn**

Medical consultant Dr. Richard Gunn prepared a Psychiatric Review Technique form (PRTF) on February 1, 2007.  (AR 263-273).  Dr. Gunn determined that Mr. Shupick suffered from an amnestic disorder and personality disorder not otherwise specified and opined that a Mental Residual Functional Capacity Assessment (MRFC) was needed.  (AR 263-272).  Dr. Gunn opined that these disorders resulted in the following functional limitations: no restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  (AR 273).  Dr. Gunn indicated that the evidence did not establish the presence of the "C" criteria.  (AR 274).

On May 14, 2007, medical consultant Dr. Stephanie Fuller reviewed the evidence in Mr. Shupick's file and affirmed the PRTF.  (AR 277).

On February 1, 2007, Dr. Gunn also prepared a Mental Residual Functional Capacity Assessment (MRFC) of Mr. Shupick's mental health issues.  (AR 278-281).  The MRFC represents a summary of Dr. Gunn's conclusions after reviewing Mr. Shupick's file.  (AR 278).  Dr. Gunn

considered 20 mental activities to determine whether Mr. Shupick had the capacity to sustain each mental capacity on an ongoing basis over a normal workday and workweek.  Id.  In completing the assessment, Dr. Gunn evaluated Mr. Shupick's ability to understand and remember locations, instructions, and work procedures, his ability to concentrate, carry out instructions, and make decisions, his ability to interact with the public, work with coworkers, and accept instructions and criticisms from supervisors, and his ability to adapt to changes and set goals.  (AR 278-279).  Dr. Gunn opined that Mr. Shupick was not significantly limited in most categories.  Id.  Mr. Shupick was moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, and to accept instructions and respond appropriately to criticism from supervisors.  Id.  Dr. Gunn also assessed Mr. Shupick's functional capacity, noting as follows:

> This claimant alleges problems dating back to when he was 17 years old but he became a nurse (RN) and worked for 20 years in a hospital.  He is now medically retired from that job.  His testing shows intellect at the average range and some limitations in some immediate memory tasks but the limitations are close [to] the borderline range.  The job as a RN was complex and although he has been seen as being unable to be a nurse he has the basic skills to do routine works of a non-technical nature.  The MRFC is consistent with routine work.  He is not limited in any of his ADL tasks.

> He can do routine work.

(AR 280).

On May 14, 2007, Dr. Fuller reviewed the evidence in Mr. Shupick's file and affirmed the assessment.  (AR 284).

**H.    Mayo Clinic**

Upon referral from Dr. James Bowman, Drs. Robert DePompolo and Thomas Bergquist of the Brain Rehabilitation Program at the Mayo Clinic met with Mr. Shupick on January 3-4, 2008, for a neuropsychological evaluation.  (AR 319-328).  Mr. Shupick complained of persistent problems with memory, focus, attention, and irritability.  (AR 325).  Dr. DePompolo noted that Mr. Shupick was independent in his activities of daily living. (AR 324).  He noted that Mr. Shupick was alert and followed directions well, but had difficulty staying focused.  (AR 325).  Dr. DePompolo recommended psychometric testing, which took place on January 3, 2008.  (AR 325-326).

Dr. Bergquist met with Mr. Shupick on January 4, 2008.  (AR 321). Mr. Shupick stated that, when his job changed to the acute nursing floor, "he felt unable to keep up with the demands of that job and eventually, apparently on his own initiative, decided to quit given concerns he had that he was not doing his job up to a satisfactory level."  Id.  Dr. Bergquist noted that Mr. Shupick was reluctant to seek the assistance of post acute rehabilitation services.  Id.

Psychometric testing indicated that Mr. Shupick's cognitive performance was relatively good.  Id.  Mr. Shupick performed well in most

respects of learning and memory retention. (AR 327). However, the testing identified "some limited and circumscribed impairments in cognitive functioning, mainly in novel problem solving as well as some very limited cognitive inefficiencies." (AR 321). Particularly, Mr. Shupick showed some difficulty with complex problem solving and some slight difficulty in speed of performance and some slight inefficiency. (AR 327). Dr. Bergquist noted that, since the end of Mr. Shupick's employment, he "has had limited structure in his life, is relatively sedentary, and appears despondent if not actually depressed, possibly in the form of an adjustment disorder with depressed mood." (AR 323). Mr. Shupick's feelings of hopelessness and self-deprecation significantly interfered with his desire to return to work. Id. Dr. Bergquist made the following recommendation:

> I reviewed my impressions with Mr. Shupick and indicated that in my view his best course of treatment would be to go back to Mr. Ron Sasso at the Community Transitions Program in Rapid City, engage in a course of counseling and other services that might help in greater involvement in the community and eventual return to work. This would include individual counseling, possible psychiatric consultation to consider psychotropic medication, involvement in group therapy or group treatment sessions, and depending on the nature and demands of a job situation, tailored cognitive rehabilitation to help him develop strategies that he can apply in a specific job situation. This may also help him in aspects of his life which he reports having difficulties in his home life such as financial management.

Id.

Dr. Berguist opined that returning to work would be a realistic goal with appropriate rehabilitation and vocational planning. (AR 327).

Following Dr. Bergquist's consulation, Dr. DePompolo met with Mr. Shupick again to review their findings. (AR 320-321). Mr. Shupick indicated that he was not interested in medication to manage his mood disorder. (AR 320). Dr. DePompolo noted that Mr. Shupick performed generally well on the testing with the exception of problems with his speed in mental processing and novel problem solving. Id. Given the damage to Mr. Shupick's frontal lobes, Dr. DePompolo was not surprised that Mr. Shupick had difficulty "moving from long term care patients that required very little in terms of problem solving to acute care where the practice was faster paced and required more novel problem solving." Id.

## I. Mr. Ron Sasso

Mr. Ron Sasso of the Community Transitions Services for People with Brain Injury had met with Mr. Shupick sporadically since March of 2003. (AR 348). In letters dated March 21, 2008, and March 28, 2008, Mr. Sasso indicated that Mr. Shupick had significant deficits in his mental flexibility, processing speed, problem-solving skills, socialization, and emotional skills. (AR 330, 348). Mr. Sasso opined that Mr. Shupick lacked the cognitive abilities and social skills to be successful in employment. (AR 348). However, Mr. Sasso indicated that Mr. Shupick would benefit from working

again as Mr. Shupick was "feeling a little lost" since not working. (AR 330). Mr. Sasso cautioned that Mr. Shupick should find a position where he could work effectively and confidently within his abilities. Id.

**J.      Assessments by Dr. Thomas Atkin**

On May 27, 2008, Dr. Thomas Atkin prepared both a Medical Source Statement and PRTF. (AR 331-347). The Medical Source Statement assessed Mr. Shupick's mental ability to do work-related activities on a sustained basis[8] in light of his impairments. (AR 331). Dr. Atkin opined that Mr. Shupick had no restriction in his ability to understand and remember simple instructions and to carry out simple instructions, had a mild restriction in his ability to make judgments on simple work-related decisions and to understand and remember complex instructions, and had a moderate restriction in his ability to carry out complex instructions and to make judgments on complex work-related decisions. Id. Dr. Atkin further opined that Mr. Shupick had a moderate restriction in his ability to interact appropriately with the public, had a mild restriction in his ability to interact appropriately with supervisors and co-workers, and had a marked restriction in his ability to respond appropriately to usual work situations and to changes in a routine work setting. (AR 332).

---

[8]Sustained basis refers to "the ability to perform work-related activities eight hours a day for five days a week, or an equivalent work schedule." (AR 331).

Dr. Atkin also prepared a PRTF assessing Mr. Shupick's mental impairments and functional limitations from his alleged onset date of disability to the date of the assessment.  (AR 334-347).  Dr. Atkin found that Mr. Shupick suffered from cognitive issues secondary to his traumatic brain injury, depression not otherwise specified and anxiety not otherwise specified.  (AR 334-343).  Dr. Atkin opined that Mr. Shupick had a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  (AR 344).  Dr. Atkin indicated that the evidence did not establish the presence of the "C" criteria.  (AR 345).  Dr. Atkin further stated as follows:

> Claimant suffer [sic] TBI [traumatic brain injury] at age 17 in 1967. Given the significance of the injury[,] the claimant has done extremely well.  Neuropsychological testing . . . indicate mild cognitive limitations primarily in efficiency and executive functioning.  There was also noted to be some memory issues.  All of those problems are of a long standing nature and only seemed to create increased problems when he underwent a job change which specifically taxed those cognitive skills . . . . Complicating those issues is the decreased structure in the claimant's life since he retired from his nursing position. Although depression and anxiety are mentioned as possible contributors[,] the claimant has refused medical treatment for depression . . . and anxiety has never been addressed by his treating sources as a primary focus of treatment.  In general, even with his limitations, "returning to work would be a realistic goal.". . . Such a job should not require complex problem solving or multiple changes in routine.

(AR 346).

# THE DECISION OF THE ALJ

On August 19, 2008, the ALJ issued a written opinion denying

Mr. Shupick's application for DIB benefits.  (AR 9-18).  The ALJ considered

the five-step evaluation process established by the Agency for determining

whether a claimant is disabled.[9]  (AR 22-27).  The ALJ made several findings

of fact and conclusions of law.

The ALJ determined that Mr. Shupick met the insured status

requirements of the Social Security Act through December 31, 2011.[10]

(AR 12).  The ALJ also determined that Mr. Shupick had not engaged in

substantial gainful activity since March 21, 2006, the alleged onset date of

disability.  Id.

---

[9]The five-step sequential evaluation process is: (1) whether the claimant
is presently engaged in a "substantial gainful activity"; (2) whether the claimant
has a severe impairment that significantly limits the claimant's physical or
mental ability to perform basic work activities; (3) whether the claimant has an
impairment that meets or equals a presumptively disabling impairment listed
in the regulations (if so, the claimant is disabled without regard to age,
education, and work experience); (4) whether the claimant has the residual
functional capacity to perform his or her past relevant work; and (5) if the
claimant cannot perform the past work, the burden shifts to the Commissioner
of the Agency to prove that there are other jobs in the national economy that
the claimant can perform.  Baker  v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir.
1998); see also AR 10-12.

[10]"To be eligible for disability insurance benefits under Title II, a claimant
must meet the statute's insurance requirements."  Davidson v. Astrue, 501
F.3d 987, 989 (8th Cir. 2007) (citing Long v. Chater, 108 F.3d 185, 187 (8th
Cir. 1997)).  For Title II disability purposes, the court will only consider a
claimant's  medical condition as it existed before the date he was last insured.
Id. (citing Long, 108 F.3d at 187).

Upon examination of the medical evidence, the ALJ found that Mr. Shupick had the following severe impairments: amnestic disorder, depression, and personality disorder not otherwise specified.  Id.  However, none of these impairments, either individually or in combination, met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (AR 14).

The ALJ found that Mr. Shupick had the following residual functional capacity ("RFC"):[11]

> . . . no physical limitations; no limitations in his abilities to understand, remember, and carry out simple instructions; mild limitations in his abilities to make judgments on simple work-related decisions and to understand and remember complex instructions; moderate limitations in his abilities to carry out complex instructions and to make judgments on complex work-related decisions; moderate limitations in his ability to interact appropriately with the public; mild limitations in his abilities to interact appropriately with co-workers and supervisors; and marked limitations in his ability to respond appropriately to usual work situations and to changes in a routine work setting.

(AR 15) (emphasis in original omitted).

The ALJ determined that, in light of Mr. Shupick's RFC, he was capable of performing past relevant work as a long-term care nurse.  (AR 17-

_____

[11]Before determining whether Mr. Shupick was able to return to his past work, the ALJ was required to determine his RFC.  Roberson v. Astrue, 481 F.3d 1020, 1023 (8th Cir. 2007).  "The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations."  Id. (citations omitted).

18).  Consequently, the ALJ found that Mr. Shupick was not disabled.  (AR 18).

**STANDARD OF REVIEW**

The Commissioner's findings must be upheld if supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006).  The court must review the Commissioner's decision to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).

Substantial evidence is less than a preponderance, but enough evidence that a reasonable mind might find it adeqaute to support the conclusion.  Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support the Commissioner's decision.  Choate, at 869 (quoting Ellis v. Barnhart, 392 F.3d 988, 993 (8th Cir. 2005)).  The review of a decision to deny disability benefits is " 'more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; . . . [the court must] also take into account whatever in the record fairly distracts from that decision.' "  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would have decided the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and based on substantial evidence. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005). A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' " Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)). Issues of law are reviewed de novo with deference given to the Commissioner's construction of the Social Security Act. Smith, 982 F.2d at 311.

## DISCUSSION

Because the ALJ found in Mr. Shupick's favor for the first three steps of the five-step sequential analysis, Mr. Shupick challenges only the ALJ's step-four determination that he is capable of performing past relevant work as a long-term care nurse. (Docket 13). With respect to this determination, Mr. Shupick alleges that the ALJ made the following two errors of law that warrant the reversal of the ALJ's decision: (1) the ALJ failed to make explicit findings as to the mental demands of a long-term care nurse; and (2) substantial evidence did not support the ALJ's finding that Mr. Shupick could perform his past work as a long-term care nurse. Id.

**A.    Whether the ALJ Erred in Not Making Explicit Findings as to the**

**Mental Demands of a Long-term Care Nurse**

Eighth Circuit precedent mandates that an ALJ make the necessary

findings of fact before determining a claimant can return to past relevant

work, as stated in the following passage:

> An ALJ's decision that a claimant can return to his past work must
> be based on more than conclusory statements.  The ALJ must
> specifically set forth the claimant's limitations, both physical and
> mental, and determine how those limitations affect the claimant's
> residual functional capacity.  The Administration's own interpretation
> of the regulations reflects this need for specificity.  The determination
> that a claimant retains the functional capacity to perform past work
> . . . has far-reaching implications and must be developed and
> explained fully in the disability decision.  This court has held . . . that
> [a] conclusory determination that the claimant can perform past
> work, without these findings, does not constitute substantial evidence
> that the claimant is able to return to his [or her] past work.
> . . . .
> Defining a claimant's residual functional capacity is not the only task
> required at step four.  The ALJ must also make explicit findings
> regarding the actual physical and mental demands of the claimant's
> past work.  The ALJ may discharge this duty by referring to the
> specific job descriptions in the Dictionary of Occupational Titles
> [DOT] that are associated with the claimant's past work.

Pfitzner v. Apfel, 169 F.3d 566, 568-69 (8th Cir. 1999) (citations and

internal quotation marks omitted).

The court agrees with Mr. Shupick that the ALJ in this case had a

duty to make explicit findings as to the demands of Mr. Shupick's past work

as a long-term care nurse and to compare those findings to his RFC before

deciding he could perform the relevant duties of a long-term care nurse.

Samons v. Astrue, 497 F.3d 813, 821 (8th Cir. 2007); Lowe v. Apfel, 226

F.3d 969, 972 (8th Cir. 2000). The ALJ's findings with respect to the step-

four determination are as follows:

> . . . **The claimant is capable of performing past relevant work as a long term care nurse. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR § 404.1565).**
>
> Mr. Tysdal submitted a written exhibit that indicated the Dictionary of Occupational Titles classified the job of Registered nurse (075.364-010) as medium exertion and SVP-7 (Ex. 19E). As described by the claimant, this job was medium exertion (Ex. 5E). The claimant said he was a lead worker and supervised 2 to 4 other people. The claimant testified that he was not able to keep up with the stresses of acute care. He was too worried about making a mistake. There is no indication that the claimant was asked to leave the job in acute care. The claimant did not seek employee counseling. He has not gone to Vocational Rehabilitation since March 2006 and he is not in therapy, psychological counseling, or medication. In short, the claimant is not following medical advice and refusing to address his symptoms. None of his treating medical sources have stated that he is not capable of working. They have given their opinions that he is not able to work as an acute care nurse only.
>
> In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed. After the hearing, the claimant's representative submitted 18 pages of "O-Net" material regarding the job of registered nurse (Ex. 25E). This material is not relevant to the claim. The Social Security Act and applicable regulations mandate the use of the Dictionary of Occupational Titles.

(AR 17-18) (emphasis in original).

The court finds that the ALJ's step-four findings were conclusory

rather than explanatory or explicit. Although the ALJ adequately set forth

Mr. Shupick's RFC, the ALJ simply cited to the DOT's description of a registered nurse without describing the specific mental demands of Mr. Shupick's past job as a long-term care nurse. In this case, it was not enough for the ALJ to merely refer to the DOT code and exertion level for a registered nurse, although, perhaps in other cases where the DOT contains an appropriate classification for the claimant's past relevant work, it would be. As explained at the administrative hearing by vocational expert William Tsydal, Mr. Shupick's duties as a long-term care nurse as actually performed do not precisely match *any* DOT classification. Thus, merely citing to the DOT classification for a registered nurse would not be sufficient to identify the mental demands of Mr. Shupick's past work as a long-term care nurse. The ALJ clearly erred in this regard. Whether this error prejudiced Mr. Shupick or was harmless depends on whether the ALJ's determination that Mr. Shupick can perform the duties of a long-term care nurse is supported by substantial evidence in the record. If substantial evidence exists, then the ALJ's error is harmless and remand would be inappropriate. <u>Samons</u>, 497 F.3d at 821-822 (finding remand inappropriate where substantial evidence supported ALJ's finding that claimant could return to her past work despite ALJ's failure to make explicit findings).

**B.**     **Whether Substantial Evidence Exists to Support the ALJ's Determination that Mr. Shupick Could Perform the Duties of a Long-Term Care Nurse**

The court first notes that Mr. Shupick bears the burden of proving that his impairments prevent him from performing past relevant work.  King v. Astrue, 564 F.3d 978, 979 n. 2 (8th Cir. 2009) (claimant bears the burden of showing that he is disabled for the first four steps of the five-step analysis).  "Where the claimant has the residual functional capacity to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled."  Lowe v. Apfel, 226 F.3d 969, 973 (8th Cir. 2000) (citing Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); 20 C.F.R. §§ 404.1520(e) and 416.920(e)); see also Samons v. Astrue, 497 F.3d 813, 821 (8th Cir. 2007) ("An ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as she actually performed it or as generally required by employers in the national economy.") (citing Martin v. Sullivan, 901 F.2d 650, 653 (8th Cir. 1990)).  To be "relevant," past work must have been done within the last 15 years, lasted for a long enough period of time for the claimant to have learned to do the work, and must qualify as substantial gainful activity, that is, the earnings must average more than $300 per month.  Vincent v. Apfel,

264 F.3d 767, 769 (8th Cir. 2001) (citing 20 C.F.R. §§ 416.965(a), 416.974(b)(2)).

The court also notes that Mr. Shupick does not challenge the ALJ's determination of his RFC. The ALJ determined Mr. Shupick's RFC as follows:

> . . . no physical limitations; no limitations in his abilities to understand, remember, and carry out simple instructions; mild limitations in his abilities to make judgments on simple work-related decisions and to understand and remember complex instructions; moderate limitations in his abilities to carry out complex instructions and to make judgments on complex work-related decisions; moderate limitations in his ability to interact appropriately with the public; mild limitations in his abilities to interact appropriately with co-workers and supervisors; and marked limitations in his ability to respond appropriately to usual work situations and to changes in a routine work setting.

(AR 15) (emphasis in original omitted).

In evaluating Mr. Shupick's ability to perform the work of a long-term care nurse, the ALJ considered the testimony of vocational expert William Tysdal. The Agency's regulations provide for the use of this testimony, as set forth in 20 C.F.R. § 404.1560(b)(2). This regulation states as follows:

> (2) Determining whether you can do your past relevant work. We will ask you for information about work you have done in the past. We may also ask other people who know about your work. (See § 404.1565(b).) We may use the services of vocational experts or vocational specialists, or other resources, such as the "Dictionary of Occupational Titles" and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity. A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge

concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy. Such evidence may be helpful in supplementing or evaluating the accuracy of the claimant's description of his past work. In addition, a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.

20 C.F.R. § 404.1560; see also Wagner v. Astrue, 499 F. 3d 842, 853 (8th Cir. 2007) ("The regulations provide that the ALJ may elicit testimony from a vocational expert in evaluating a claimant's capacity to perform past relevant work."). The Eighth Circuit has "implicitly approved" of the use of vocational expert testimony by an ALJ when determining a claimant's ability to perform past relevant work. Wagner, 499 F.3d at 853-854.

The ALJ posed a hypothetical question to Mr. Tysdal as to whether an individual of Mr. Shupick's age, work history, education, and RFC could

perform the work of a long-term care nurse.[12] (AR 43). The court notes that Mr. Shupick does not allege that the ALJ's hypothetical question was not properly-phrased. In response to the hypothetical question, Mr. Tysdal opined that such an individual could perform the work of a long-term care nurse. Id. Mr. Tysdal testified that the duties of a long-term care nurse included "distributing medications, providing general care, day-to-day care for long-term patients, that evolves [sic] with Alzheimer's and other -- cancer, and other long-term illnesses, providing that routine care on a daily basis, possibly feeding, bathing, activities of daily living, assistance for those patients." (AR 43-44).

Mr. Tysdal further testified that Mr. Shupick's duties as a long-term care nurse were more similar to those of a nurse's aid rather than a

---

[12]Testimony from a vocational expert constitutes substantial evidence only when the testimony is based on a properly-phrased hypothetical question. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005) (citing Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999)). A properly-phrased hypothetical question is one that includes all of the claimant's impairments that are supported by substantial evidence in the record as a whole. Finch v. Astrue, 547 F.3d 933, 937 (8th Cir. 2008) (citing Swope v. Barnhart, 436 F.3d 1023, 1025 (8th Cir. 2006)). However, "the hypothetical question need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture 'the concrete consequences' of those impairments." LaCroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006) (citing Roe v. Chater, 92 F.3d 672, 676-77 (8th Cir. 1996)).

registered nurse.[13]  (AR 44).  Accordingly, such work involved routine tasks and "very little change" in treatment and care of long-term patients.  Id. Mr. Tysdal acknowledged that the daily routine of a long-term nurse would change when new patients came into the ward, when patients' medications were adjusted, and when patients' physical conditions fluctuated.  (AR 45-48, 58-59).  Mr. Tysdal opined that "[t]here may be some minor changes, but it's still a usual work setting . . . ."  (AR 59).  He also testified that if a long-term care nurse was not capable of asking for help when dealing with major changes in patient care and health, then the nurse could not perform the work.  (AR 59-60).

Dr. Thomas Atkin, a clinical psychologist, testified at the administrative hearing as a medical expert.  (AR 21).  Dr. Atkin testified that Mr. Shupick had the following psychological impairments: cognitive issues secondary to a traumatic brain injury; depression not otherwise specified; and anxiety disorder not otherwise specified.  (AR 22).  Dr. Atkin opined as to Mr. Shupick's long-term psychological limitations as follows:

> The Claimant suffered a traumatic brain injury in 1967, at the age of
> 17.  And so all of his work experience has been subsequent to that

---

[13]Mr. Tysdal testified that the DOT did not list the duties of a long-term care nurse.  (AR 55).  Mr. Tysdal testified that Mr. Shupick's position as a long-term care nurse was closest to a licensed practical nurse or a practical nurse, which are both semi-skilled occupations.  (AR 57).  Mr. Tysdal identified the DOT code for a licensed practical nurse as 079.374-014 (SVP-6) and the DOT code for a practical nurse as 354.374-010 (SVP-4).  (AR 57-58).

brain injury. And he's done extremely well, given the seriousness of that and the significance of the injury. Neuropsychological testing . . . indicate mild cognitive limitations primarily in his cognitive efficiency and his (inaudible) functioning. There are also some specific memory issues. But, again, all of those problems are of long-standing nature. They did seem to increase secondary to a job change, which specifically taxed those cognitive skills . . . . The Claimant has actually had -- appeared to have more difficulty since he retired from the nursing position, probably secondary to decreased structure in his life. And although depression and anxiety are mentioned as possible contributors, the Claimant's refused medical treatment for depression . . . and anxiety has never been addressed by his treating sources as a primary physician. In general, even with his limitations, as one doctor stated, "Returning to work would be a realistic goal.". . . If he does return to work, that job should not require complex problem solving or multiple changes in his routine.

(AR 23-24).

Dr. Atkin testified that a long-term care nurse, as opposed to an acute-care nurse, seldom deals with situations requiring "quick, decisive, and multiple decisions being made in a short time" because the patients are more stable. (AR 24). Dr. Atkin indicated that, because the patient population is more stable, a long-term care nurse carries out the same routine over and over again with the same patients. Id. Dr. Atkin further opined as follows:

. . . there are things [rehabilitation and vocational planning], certainly, that are going to increase Mr. Shupick's success in returning to work. And as I stated, there are certain kinds of jobs which would not be a good idea for him. And that would be in the vocational planning aspect . . . for him to go back to work into an acute care kind of position would not be a good idea. He would need to take into account what his limitations are. But he functioned for a very long time with those limitations, and, in fact, was not fired from his position. And there's been nothing to indicate that there's

been a significant decrease in his functional ability since that time. So I think . . . that if he's careful, in terms of the types of jobs that he gets, and that would probably require some outside source providing some counseling with them, that he can return to work.

(AR 28).

Mr. Shupick testified at the administrative hearing as to his previous duties and responsibilities as a long-term care nurse. He stated that "the routine from one day to the next was the same." (AR 37). He indicated that he was in charge of caring for a certain number of patients, many of whom suffered from a variety of illnesses. (AR 37-38). Such care included administering medication, turning and repositioning, feeding, bathing, and other tasks involving personal hygiene. Id. Mr. Shupick testified that he cared for the same patients over and over again. (AR 38). He also testified that he experiences problems with his memory and has difficulty communicating with others. (AR 35). He indicated that he has had to use vocational rehabilitation services in the past to secure employment. (AR 35).

Mr. Shupick described his daily routine as "very rigid and structured." (AR 34). He frequents the same establishments and performs the same leisure activities every day with few exceptions. (AR 33-34). He indicated that, even when working, he did "the same thing" every day. (AR 34).

In determining whether a claimant can perform past relevant work, the Agency may consult the DOT and its companion volumes and

supplements.  20 C.F.R. § 404.1560(b)(2) ("We [the Agency] may use the services of vocational experts or vocational specialists or other resources, such as the 'Dictionary of Occupational Titles' and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us to determine whether you [the claimant] can do your past relevant work, given your residual functional capacity.").  The DOT is a comprehensive and organized listing of jobs in the United States economy that provides standardized information regarding job specifications and requirements and is used in employment counseling, job placement, occupational and career guidance, and labor market information services.  See www.oalj.dol.gov/libdot.htm.[14]  The DOT "lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings."  Social Security Ruling (SSR) 00-4p.

Social Security Ruling 00-4p provides that occupational evidence offered by a vocational expert or vocational specialist should be consistent with the occupational information supplied by the DOT.

Occupational evidence provided by a VE [vocational expert] or VS [vocational specialist] generally should be consistent with the occupational information supplied by the DOT.  When there is an

_____

[14]An online version of the revised fourth edition of the DOT is available on the website of the United States Department of Labor, www.oalj.dol.gov/libdot.htm.

apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such inconsistency.

Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

Id.

The Eighth Circuit has held that, when there is a conflict between expert testimony and the DOT, the DOT controls unless its classifications are rebutted. Dobbins v. Barnhart, 182 Fed. Appx. 618, 619 (8th Cir. 2006) (citing Porch v. Chater, 115 F.3d 567, 572 (8th Cir. 1997); Montgomery v. Chater, 69 F.3d 273, 276 (8th Cir. 1995); Smith v. Shalala, 46 F.3d 45, 47 (8th Cir. 1995). The DOT classifications may be rebutted by VE testimony that shows that particular jobs, regardless of their classifications, may be ones that the claimant can perform. Young v. Apfel, 221 F.3d 1065, 1070 (8th Cir. 2000) (citing Montgomery, 69 F.3d at 276) (additional citation omitted).

Prior to the administrative hearing, Mr. Tysdal provided a work history that characterized Mr. Shupick's past work as that of a registered nurse, DOT code 075.364-010. (AR 221). The DOT classifies the exertional

level of a registered nurse as medium and rates the skill level as a 7.[15] Id.
At the administrative hearing, however, Mr. Tysdal testified that, in light of
Mr. Shupick's testimony regarding his past job duties, the job that
Mr. Shupick actually performed as a long-term care nurse was more similar
to a licensed practical nurse (DOT code 079.374-014), with a SVP of 6, or a
practical nurse (DOT code 354.374-010), with a SVP of 4.  (AR 55-58).
Mr. Shupick argues that his RFC is not consistent with the job
requirements of either a licensed practical nurse or practical nurse, but
focuses on the practical nurse position as it has the lowest SVP level.
(Docket 13).

According to the DOT, a practical nurse, which has a SVP of 4 and is
a semi-skilled profession, performs the following tasks:

> Cares for patients and children in private homes, hospitals,
> sanatoriums, industrial plants, and similar institutions:  Bathes and
> dresses bed patients, combs hair, and otherwise attends to their
> comfort and personal appearance.  Cleans room, and changes bed
> linen.  Takes and records temperature, pulse, and respiration rate.
> Gives medication as directed by physician or NURSE, GENERAL
> DUTY (medical ser.) 075.364-010, and makes notation of amount and
> time given.  Gives enemas, douches, massages, and alcohol rubs.
> Applies hot and cold compresses and hot water bottles.  Sterilizes
> equipment and supplies, using germicides, sterilizer, or autoclave.
> Prepares food trays, feeds patients, and records food and liquid

---

[15]The DOT lists a specific vocational preparation (SVP) time for each
described occupation.  Unskilled work corresponds to a SVP of 1-2; semi-
skilled work corresponds to a SVP of 3-4; and skilled work corresponds to a
SVP of 5-9.  SSR 00-4p.  Unskilled, semi-skilled, and skilled work are defined
in 20 C.F.R. § 404.1568.

intake and output. Cooks, washes, cleans, and does other housekeeping duties in private home.  May give injections . . . .

www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT03A.HTM.

At the hearing, Mr. Tysdal testified that Mr. Shupick's duties as a long-term care nurse included "distributing medications, providing general care, day-to-day care for long-term patients, that evolves [sic] with Alzheimer's and other -- cancer, and other long-term illnesses, providing that routine care on a daily basis, possibly feeding, bathing, activities of daily living, assistance for those patients." (AR 43-44).  This description is consistent with the DOT's synopsis of the work performed by a practical nurse.  Mr. Shupick testified at the hearing that he was in charge of caring for a certain number of patients, many of whom suffered from a variety of illnesses.  (AR 37-38).  Such care included administering medication, turning and repositioning, feeding, bathing, and other tasks involving personal hygiene.  Id.  Mr. Shupick's description of the duties he actually performed as a long-term care nurse appears to be consistent with Mr. Tysdal's testimony and the DOT's synopsis of the work performed by a practical nurse.

Thus, the court is not persuaded by Mr. Shupick's argument that

Mr. Tysdal's testimony conflicts with the DOT in any meaningful way.[16]

Even if such a conflict existed, the testimony of both Mr. Tysdal and

Mr. Shupick himself regarding the routine nature of Mr. Shupick's work as

a long-term care nurse *as actually performed* would rebut the DOT

classifications.  See Young, 221 F.3d at 1070 (finding that the DOT

classifications may be rebutted by VE testimony that shows that particular

jobs, regardless of their classifications, may be ones that the claimant can

perform) (citing Montgomery, 69 F.3d at 276) (additional citation omitted).

The court also notes that the DOT classifications represent only the

" 'approximate maximum requirements for each position, rather than [the]

range.' " Carlson v. Chater, 74 F.3d 869, 871 (8th Cir. 1996) (quoting Jones

v. Chater, 72 F.3d 81, 82 (8th Cir. 1995)); see also Wheeler v. Apfel, 224

F.3d 891, 897 (8th Cir. 2000) (finding plaintiff's " 'reliance on the DOT as a

definitive authority on job requirements [was] misplaced . . . for DOT

---

[16]Mr. Shupick points to The Revised Handbook for Analyzing Jobs
(RHAJ).  This publication of the Department of Labor "contains the
methodology and benchmarks used by the cooperative Federal-State
Occupational Analysis Program in gathering and recording information about
jobs."  U.S. Department of Labor, The Revised Handbook for Analyzing Jobs
(1991), p. i.  Mr. Shupick alleges that, according to the RHAJ, the required
temperaments for working as a practical nurse are V (performing a variety of
duties), S (performing effectively under stress), and P (dealing with people).
(Docket 13 at p. 20).  However, the RHAJ does not provide the specific
temperaments for each occupation, and, thus, the court is unclear as to where
Mr. Shupick found his information.

definitions are simply generic definitions that offer the approximate requirements for each position, rather than their range.' ") (quoting <u>Hall v. Chater</u>, 109 F.3d 1255, 1259 (8th Cir. 1997)).  SSR 00-4p cautions that the DOT "lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings.  A VE, VS, or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT."  SSR 00-4p.

The court finds that there is substantial evidence to support the ALJ's determination that Mr. Shupick can perform his past work as a long-term care nurse.  The ALJ posed a properly-phrased hypothetical question to Mr. Tysdal that included all of Mr. Shupick's functional limitations to which Mr. Shupick does not object.  Mr. Tysdal opined that Mr. Shupick could return to his previous work as a long-term care nurse.  <u>See</u> <u>Wheeler</u>, 224 F.3d at 897 (rejecting claimant's arguments that the DOT descriptions for jobs identified by the VE were inconsistent with claimant's RFC and that the ALJ erred in relying on the VE's testimony when the VE responded to a properly-worded hypothetical question that included all of claimant's restrictions).  Dr. Atkin testified that Mr. Shupick could return to work even given his psychological limitations.  Dr. Atkin noted that Mr. Shupick's limitations had been present since his brain injury, yet he was able to

perform his work as a long-term care nurse for an extensive period of time. Dr. Atkin also opined that Mr. Shupick's functional ability had not significantly decreased since the end of his employment. There is no evidence that Mr. Shupick performed his duties as a long-term care nurse unsatisfactorily, e.g., he was not the subject of any serious disciplinary action and he was not fired.[17]

Returning to work as an acute-care nurse would obviously be incompatible with Mr. Shupick's RFC. The ALJ did not suggest that he could do so. However, Mr. Shupick's RFC is compatible with the job requirements of a long-term care nurse as actually performed by him for an extensive period of time. Mr. Shupick's RFC includes a marked limitation in his ability to respond appropriately to usual work situations and to changes in a routine work setting. Yet, Mr. Shupick himself testified that his job routine was the same on a daily basis. The court does not doubt that Mr. Shupick's duties as a long-term care nurse changed periodically–all jobs have some level of change–but this fact does not foreclose Mr. Shupick's ability to return to work. Mr. Shupick's limitation in handling change is marked, but not complete.

---

[17]On November 1, 2005, Mr. Shupick's employer, the VA Black Hills Health Care System, by and through its nurse manager, issued a letter of instruction to Mr. Shupick on November 1, 2005, indicating some areas of concern as to his performance. (AR 224-225). However, given the date of this letter, the court assumes that its contents speak to Mr. Shupick's ability to perform the duties of an acute-care nurse, which is not at issue here.

The court notes that the ALJ characterized Mr. Shupick's past relevant work as that of a registered nurse, DOT code 075.364-010 (SVP-7). Mr. Tysdal opined that, based on Mr. Shupick's description of his job duties as actually performed, his work was more similar to a practical nurse or a licensed practical nurse. This discrepancy is harmless because substantial evidence in the record exists that Mr. Shupick can perform his past work duties as a long-term care nurse *as actually performed*, regardless of which DOT classification is applied. Thus, the court finds that the ALJ did not err in determining that Mr. Shupick could return to his past relevant work as a long-term care nurse.

## CONCLUSION

In accordance with the above discussion, it is hereby

ORDERED that the decision of the Commissioner is affirmed and Mr. Shupick's complaint is dismissed.

IT IS FURTHER ORDERED that the Clerk of Courts enter judgment in favor of the defendant Michael J. Astrue, Commissioner of Social Security, and against plaintiff Stephen Shupick.

Dated March 25, 2010.

BY THE COURT:

/s/ *Jeffrey L Viken*
JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE